**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
_____

ARTHUR H. COBB and
GEORGE L. SALY,


           Plaintiffs,

v.                      **MEMORANDUM OF LAW & ORDER**
                            Civil File No. 05-2439 (MJD/AJB)

UNITED STATES DEPARTMENT
OF EDUCATION OFFICE FOR CIVIL
RIGHTS, et al.,

           Defendants.
_____

Arthur H. Cobb and George L. Saly, pro se.

Mary Jo Madigan, Assistant United States Attorney, counsel for United States Department of Education Office for Civil Rights and on behalf of Margaret Spellings, Algis Tamosiunas, Judith E. Levitt, and Linda A. McGovern.
_____

## I.   INTRODUCTION

This matter is before the Court on Defendants' Motion to Dismiss. [Docket No. 4] The Court heard oral argument on March 22, 2006.

## II.   FACTUAL BACKGROUND

Plaintiffs Arthur Cobb and George Saly are Minnesota residents and fathers of female ice hockey players. It is unclear from the Complaint whether Plaintiffs'

1

daughters are current or former high school ice hockey players.

Defendants are the United States Department of Education ("DOE") Office for Civil Rights ("OCR") and several DOE employees in their official capacity: DOE Secretary Margaret Spelling, OCR Compliance Director Algis Tamosiunas, OCR Senior Civil Rights Counsel Judith E. Levitt, and OCR Midwestern Division Director Linda A. McGovern.  OCR is a federal agency responsible for enforcing the provisions of Title IX to the Education Amendment of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX").

The Minnesota State High School League ("the League") is a third party responsible for administration of the girls' and boys' state interscholastic varsity ice hockey tournaments.  The League receives federal financial assistance and benefits in the form of fee contributions from its member schools.

Plaintiffs have submitted a lengthy Complaint and Exhibit, which total 87 pages.  The Complaint contains considerable data concerning the various tournament venues involved in this case, as well as a substantial number of uncredited quotations.  Defendants have submitted exhibits to accompany their motion to dismiss.  Because these exhibits do not contradict the factual allegations of the Complaint and in many cases provide the source or context for the uncredited quotes in the Complaint, the Court may consider these materials in the course of deciding upon the motion to dismiss.

A court may consider certain outside materials, such as matters of public record, materials that do not contradict the complaint, and materials that are necessarily embraced by the pleadings, without converting the motion into one for summary judgment. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999). A document constitutes a matter outside the pleadings if its "significance is disputed" and it contradicts the allegations in the complaint. BJC Health Sys. v. Columbia Cas. Co., 348 F.3d 685, 688 (8th Cir. 2003).

### A.    The Initial OCR Complaint

On March 15, 2000, OCR received a complaint ("Complaint I") filed by Minnesota resident Vince Muehe, alleging that female high school interscholastic varsity ice hockey players in Minnesota were subjected to sex discrimination because the League did not provide boys and girls with equal access to comparable competitive facilities during the final round of the state hockey tournament. At that time, the boys played the final round of their tournament at the Xcel Energy Center ("Xcel"), a large multi-purpose arena that seats over 18,000 people, and that has been called one of the nation's finest hockey arenas. The girls played the final round of their tournament at the Minnesota State Fair Coliseum ("Coliseum"), which seats approximately 5,200 people. The Coliseum was built in 1951 to host horse shows and livestock judging. The OCR opened an investigation of the matter.

### B.     The Commitment Letter

In response to the OCR investigation, the League voluntarily submitted a Letter of Commitment to OCR on September 8, 2000, pledging to provide the girls and boys with comparable facilities for the final round of the ice hockey tournament and to relocate the girls' hockey tournament from the Coliseum to the University of Minnesota's Mariucci Arena.  (Madigan Exh. B.)  The letter stated that the League would update OCR as to its progress on or before November 15, 2000.  Based on this Commitment, the OCR informed the League and the Complainant that it would monitor the League's implementation of its commitment and would resume its investigation if the League failed to fulfill its pledge.  The OCR Case Resolution Manual provides that OCR may attempt to resolve a complaint by negotiating an agreement with the funds recipient.  (Madigan Exh. AA.)

In a letter dated November 15, 2000 and addressed to OCR attorney Judith Levitt, League director David Stead referenced a telephone call with Levitt, writing, "We agreed in our conversation that the Xcel Energy Center and the Target Center are not appropriate sites for this event."  (Madigan Exh. C.)  The Complaint points to this statement as evidence of a conspiracy to deprive the female hockey players of their constitutional rights.  The letter requested permission to delay the move from the Coliseum until construction of a new

University of Minnesota campus women's ice hockey arena was completed. (Id.) The new women's arena was scheduled for completion in time for the 2003 girls' ice hockey tournament. (Id.) Stead proposed that the League would provide enhancements, at the League's expense, to the Coliseum and the girls' ice hockey tournaments until the move to the new arena could be completed. (Id.) In a letter dated December 5, 2000, Levitt replied to Stead, granting the League's request to delay the move from the Coliseum until it could move to the new arena and requesting regular status reports as to the pending move to the new arena. (Madigan Exh. D.) Plaintiffs' Complaint concludes that this permission is evidence of OCR's control over the League's venue decisions, as well as OCR's failure to investigate and monitor alleged discrimination by the League. The 2001 and 2002 girls' ice hockey tournaments were played at the Coliseum.

### C.     Ridder Arena

In a letter dated September 17, 2002, the League informed OCR that the 2003 girls' ice hockey tournament would be held at the new women's ice hockey arena, Ridder Arena, at the University of Minnesota in Minneapolis. (Madigan Exh. E.) Ridder Arena seats approximately 3,100 people. (Madigan Exh. F.) On December 19, 2002, a member of the OCR staff visited both Ridder and Xcel to compare the two sites. (Id.) On January 13, 2003, OCR issued a letter to the League stating that the League had implemented its commitment and that OCR

was terminating its monitoring of Complaint I.  (Id.)  In the letter, OCR explained that it found no evidence that Ridder was not the most comparably adequate and appropriate venue available for the final round of the girls' ice hockey tournament.  (Id.)  In considering arguments that the Xcel should be the venue for the girls' tournament, OCR determined that attendance of the tournament in past years had never exceeded the capacity of the Ridder Arena.  Plaintiffs' Complaint asserts that OCR should have applied a standard of equal, as opposed to "adequate and appropriate," to evaluate the League's venue choice.

Plaintiffs' Complaint alleges that Ridder limited the potential for the girls' hockey tournament to rise in spectator appeal and that as a "women's arena," Ridder was not selected on the basis of sex-neutral criteria, in contravention of a 1979 OCR Policy Interpretation.  44 Fed. Reg. 71,413 (Dec. 11, 1979).  The Policy Interpretation, which addresses intercollegiate athletics, makes clear that differences in the level of support for men's and women's sports programs are acceptable if the recipient of federal funds does not limit the potential for women's athletic events to rise in spectator appeal and if the levels of support are based on sex-neutral criteria.  Id.

**D.    Saly I**

On June 27, 2002, Plaintiff George Saly filed a complaint with OCR ("Saly I"), alleging the League engaged in sexual discrimination by deciding to move the

6

girls' state ice hockey tournament to a venue in St. Cloud, while the boys' state ice hockey tournament continued to be held at Xcel. The League ultimately voted to hold the tournament at Ridder from 2003-2008. Because the allegation in the complaint was being addressed in the monitoring of Complaint I, OCR administratively closed Saly I on July 31, 2002. However, OCR informed Saly that the information in his complaint would be considered by OCR as part of its monitoring of Complaint I. On February 10, 2003, Saly requested that OCR reconsider its decision to close Saly I. Responding to this request, OCR Compliance Director Algis Tamosiunas informed Saly that his request for reconsideration was being investigated. Tamosiunas also acknowledged that Saly's request alleged that OCR violated Title IX, noting that because OCR is a federal agency, it is not subject to investigation for possible violations of Title IX.

### E.   Cobb I & II

Plaintiff Arthur Cobb filed a complaint ("Cobb I") with OCR on November 12, 2002. Cobb alleged sexual discrimination by the League on the basis that the new Ridder Arena was not equal or comparable to Xcel. OCR notified Cobb on January 15, 2003 that it would not proceed with resolving his complaint because the issue had been resolved in Complaint I. In a letter dated February 11, 2003, Cobb requested that OCR reconsider its decision to close its monitoring of Complaint I, as well as its decision to close Cobb I.

On January 27, 2003, Cobb filed a second complaint ("Cobb II") with the OCR, alleging that the League violated its commitment to OCR by scheduling a girls' tournament game outside Ridder, because one tournament game was played at Mariucci Arena.  (Madigan Exh. K.)  On or about April 14, 2003, OCR learned that Cobb had filed a complaint with the Minnesota Department of Human Rights (MDHR) requesting an investigation of the same allegations as filed in Cobb II. (Madigan Exh. O.)  Pursuant to OCR case processing procedures, which provide that OCR may decline to proceed with an investigation if another federal, state, or local agency is investigating the same allegations with a comparable resolution process, OCR informed Plaintiffs that it had closed Cobb II.  (Madigan Exh. P.) OCR further advised Plaintiffs that they could refile their complaints within 60 days of MDHR's action but that OCR's review would determine only whether MDHR provided a comparable resolution process, rather than a de novo review. The MDHR ultimately dismissed the charges, concluding that a discrimination claim had not been proved.  (Madigan Exh. O.)

In response to Plaintiffs' requests for reconsideration of OCR's decision to close Complaint I, Saly I, and Cobb I, Director of the Chicago Office of OCR Linda McGovern reviewed the complaints and advised Plaintiffs that OCR acted appropriately with respect to the three complaints filed against the League. (Madigan Exh. Q.)  In a letter dated August 12, 2003, McGovern concluded that

the League was "not required to provide girls and boys with identical benefits, opportunities, or treatment," rather, the League must provide facilities that were "equal or equal in effect." (Id.)  "Equal of equal in effect" is the standard set forth in the 1979 Policy Interpretation. 44 Fed. Reg. 71,413 (Dec. 11, 1979). McGovern's letter also concluded that there was no "agreement" between OCR and the League that the Excel and Target Center were not appropriate sites for the girls' ice hockey tournament.  (Id.)  McGovern informed Plaintiff that he could appeal this decision to the Deputy Secretary of Enforcement of the DOE in Washington, D.C.  (Id.)

Plaintiff Saly appealed McGovern's decision as directed on October 22, 2003.  The OCR Special Assistant to the Deputy Assistant Secretary responded to this request on April 13, 2004, informing Saly that because the allegations were the subject of pending litigation, OCR would hold the request for review until the termination of the litigation proceedings.  (Madigan Exh. U); See infra II(G).

### F.    Cobb III & IV

Plaintiff Cobb filed a complaint ("Cobb III") with OCR on March 23, 2004, alleging that the League engaged in sex discrimination because it did not provide boys and girls with equal access to comparable facilities for the final round of the 2004 interscholastic varsity ice hockey tournament.  (Madigan Exh. S.)  On April 8, 2004, OCR informed Cobb that it was administratively closing Cobb III because

of a class action complaint filed by female high school ice hockey players in Federal District Court before Judge Tunheim in <u>Mason v. Minnesota State High School League</u>, Case No. 03-6462.  This complaint alleged that the League was in violation of Title IX because it refused to schedule the high school girls' ice hockey tournament at Xcel.  OCR's letter to Cobb explained that OCR procedures allow the agency to decline to proceed with a complaint when litigation has been filed raising the same allegations, but that Cobb could re-file within 60 days following termination of the court proceeding if there has been no decision on the merits or settlement of the complaint allegations.  The parties to the class action settled and agreed to move the girls' ice hockey tournament to Xcel beginning in February 2006.  Judge Tunheim dismissed the case with prejudice on September 28, 2004, but retained jurisdiction until April 2006.

On February 7, 2005, Plaintiff Cobb filed a complaint with OCR ("Cobb IV") alleging sex discrimination by the League because the 2005 girls' ice hockey tournament venue was not "equal, equal in effect or substantially equal" to the boys' tournament venue.  OCR informed Cobb on April 6, 2005 that the litigation had addressed Cobb IV and that OCR would administratively close Cobb IV.  OCR noted that the settlement of the litigation provided that the girls' tournament would be held at the Excel for the next three years, beginning in 2006 and that this settlement addressed Cobb's complaint.

### G.     Current Action

Plaintiffs' complaint alleges four causes of action: Count I alleges violations of equal protection rights pursuant to 42 U.S.C. §1983; Count II claims discrimination pursuant to Title IX; Count III alleges that OCR aided and abetted sex discrimination caused by the League; and Count IV alleges conspiracy to discriminate on the basis of sex pursuant to 42 U.S.C. §1985(3).  Plaintiffs seek declaratory and injunctive relief, as well as fees and costs.  Specifically, Plaintiffs seek a declaratory judgment that OCR and the several named employees applied incorrect standards and requirements and/or incorrectly applied standards and requirements in investigating, monitoring, concluding and reconsidering complaints, and that Defendants OCR and Linda McGovern failed to grant or provide genuine administrative remedies.  Plaintiffs also seek a declaratory judgment that "equal" is the correct standard in investigating, monitoring and closing discrimination claims under Title IX.  Plaintiffs request an injunction requiring Defendants to follow and apply the standards and requirements of Title IX.  Finally, Plaintiffs seek attorneys' fees and costs, to be determined at trial.

Defendants move to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) on the basis that Plaintiffs do not have standing to pursue their claims.  Defendants also move to dismiss for failure to state a claim upon which relief may be granted pursuant to

Federal Rule of Civil Procedure 12(b)(6).

### III. Discussion

The Court commends Cobb and Saly, pro se litigants, for their determination to right the injustice they perceived using the court system. Plaintiffs have presented the Court with thoughtful and compelling arguments, both in their court filings and during oral argument. Although OCR was not convinced of the merit of Plaintiffs' numerous complaints to the Agency, the Court applauds Plaintiffs' zealous and conscientious attempts to advocate against gender discrimination in interscholastic sports.

#### A. Standard of Review

The Court should grant a motion to dismiss "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Handeen v. Lemaire, 112 F.3d 1339, 1347 (8th Cir. 1997). "In considering a motion to dismiss, the court must construe the complaint liberally and assume all factual allegations to be true." WMX Tech., Inc. v. Gasconade County, Mo., 105 F.3d 1195, 1198 (8th Cir. 1997).

#### B. Subject Matter Jurisdiction

The threshold issue to be addressed is whether Plaintiffs have standing to have this Court decide the merits of the case. Article III of the Constitution limits the power of the federal courts to deciding only actual "cases" and

"controversies." U.S. Const., art. III, § 2, cl. 1; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Allen v. Wright, 468 U.S. 737, 750 (1984). In order for a federal court to exercise jurisdiction over a case or controversy, a plaintiff must have standing to pursue the claim. The doctrine of standing consists of constitutional and prudential requirements.

The constitutional requirements of standing limit federal courts to deciding only cases where the plaintiffs can show a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen, 468 U.S. at 751; Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 38 (1976). To assert an injury sufficient to confer standing, the plaintiff must have suffered an "injury in fact" --an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent. Lujan, 504 U.S. at 560. The "injury in fact" test requires that the party seeking review must be himself among the injured. Id. at 563. In addition to alleging a direct injury, plaintiffs must prove a causal connection between the injury and the conduct subject to complaint and it must be likely as opposed to speculative that the injury will be redressed by a favorable decision. Id. at 560. The party invoking federal jurisdiction bears the burden of proving each of these three constitutional elements of standing. Id. at 561. The burden of proof in a

suit challenging the legality of government action, as in this case, which does not involve Plaintiffs themselves as the objects of the action, is "substantially more difficult to establish." Id. (citing Allen, 468 U.S. at 758).

In addition to the minimum constitutional requirements, the Supreme Court has defined certain prudential considerations to guide questions of standing.  First, a plaintiff may not assert a "generalized grievance" that is suffered by all or a large class of citizens.  Schleshinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227 (1974).  Plaintiffs must also assert their own legal rights, rather than the rights of third parties, in order to have standing to sue in federal court.  Warth v. Seldin, 422 U.S. 490, 499 (1975).  Finally, the plaintiff's complaint must fall within the "zone of interests to be protected or regulated by statute or constitutional guarantee in question."  Valley Forge Christian Coll., 454 U.S. at 475.

Plaintiffs' Complaint alleges several theories of injury.  First, Plaintiffs contend that the female hockey players suffered gender discrimination as a result of OCR's failure to investigation and monitor Plaintiffs' complaints.  (Compl. ¶ 95.)  This is certainly a cognizable injury.  The Supreme Court has recognized that the denial of benefits on the basis of gender stigmatizes the disfavored class.  In Heckler v. Mathews, the Supreme Court held that discrimination, "by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the

14

disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." Heckler, 465 U.S. at 739-40 (citation omitted); see also Roberts v. United States Jaycees, 468 U.S. 609, 625 (1984) (finding that stigmatizing injury "deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic and cultural life.").

However, the Court has made clear that a plaintiff has standing to assert a stigmatizing injury only when "personally denied equal treatment." Allen, 468 U.S. at 755 (citing Heckler, 465 U.S. at 739-740). Plaintiffs have not alleged that they themselves suffered discriminatory treatment, or even that they suffered retaliation or other injury as a result of asserting the rights of the female ice hockey players. See Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005). Plaintiffs allege only that the female ice hockey players and their fans suffered the effects of gender discrimination, not that they themselves suffered personal injury as the result of Defendants' alleged discrimination.

Plaintiffs' second theory of injury appears to be that Defendants' failure to enforce Title IX harmed them because as members of society, they have a right to be free from discrimination. (Compl. ¶ 96.) During oral argument, Plaintiffs referred to the Supreme Court's decision in Roberts v. United States Jaycees to

15

advance their argument that Defendants' discriminatory acts caused a societal harm. Roberts, 468 U.S. at 609. However, this injury is overly broad. A generalized complaint is not sufficiently concrete to confer standing to pursue a claim in federal court. Schleshinger, 418 U.S. at 208. Plaintiffs are not permitted standing to assert such a general complaint. "We have consistently held that a plaintiff raising only a generally available grievance about government--claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large--does not state an Article III case or controversy." Lujan, 504 U.S. at 573-74. This type of injury is insufficient to confer standing. Having failed to allege a personal injury as a result of Defendants' conduct, Plaintiffs have failed to meet the minimum constitutional requirements for standing.

During oral argument, Plaintiffs requested the Court consider whether they have taxpayer standing to pursue their claims. There is a well-established rule barring federal taxpayer standing. See Frothingham v. Mellon, 262 U.S. 447, 487 (1928). A narrow exception to that rule exists where a challenged statute is an exercise of the legislature's taxing and spending powers and the statute exceeds specific constitutional limitations on those powers. Flast v. Cohen, 392 U.S. 83, 102-03 (1968). The Flast court found that taxpayers had standing to raise

Establishment Clause claims because that clause specifically limits the legislature's taxing and spending power.  In this case, the Court construes Plaintiffs' assertion of taxpayer standing as a challenge to OCR's use of federal tax revenue to fund allegedly discriminatory federal fund recipients.  However, the <u>Flast</u> court limited taxpayer to standing to challenges of exercises of congressional power.  <u>Id.</u> at 102; <u>See</u> <u>Schlesinger</u>, 418 U.S. at 217 (denying standing because the taxpayer plaintiffs challenged an action of the Executive Branch, rather than an exercise of congressional power).  Plaintiffs here challenge the actions of the OCR, an executive branch agency, rather than an enactment of Congress pursuant to the tax and spend clause.

     Plaintiffs point to <u>American Jewish Congress v. Corp. for Nat'l & Community Serv.</u>, 399 F.3d 351, 355-56 (D.C. Cir. 2005), in support of their standing as taxpayers.  In that case, the court found plaintiffs had taxpayer status to challenge the constitutionality of a federally chartered corporation's community service program.  However, as that case involved claims that Congress exercised its Article I, § 8, taxing and spending power in violation of the Establishment Clause, it clearly fell within the exception carved out in <u>Flast</u>.

     Plaintiffs also direct the Court to <u>Schafly v. Volpe</u>, 495 F.2d 273, 277 (7th Cir. 1974).  In <u>Schafly</u>, plaintiffs challenged the legality of a "freeze order" issued by the Department of Transportation, suspending federal funding for and closing

of highway construction projects in Madison County, Illinois for failure to comply with federal laws and directives regarding equal employment.  In that case, the plaintiffs were county residents and taxpayers who claimed that the freeze order violated the Civil Rights Act of 1964.  In holding that the plaintiffs had standing to pursue their claims, the court found that the plaintiffs were "persons aggrieved" within the meaning of § 603 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-2.  The statute explicitly grants judicial review to any person who is the recipient of the benefits of a department or agency program and who in injured by the termination of funds to the program.  Id.  The court applied a two-part test, finding that the plaintiffs suffered an "injury in fact" through the payment of fuel taxes directly into the program fund and the loss of improved highways on which to travel, and that plaintiffs were in the "zone of interests" protected by the statute.  However, that decision is distinguishable from the case at hand because the case was controlled by the explicit grant of judicial review contained in 42 U.S.C. § 2000d-2, which is not at issue in this case.  Furthermore, the court determined that the plaintiffs had suffered an "injury in fact."  Thus, the plaintiffs in Schafly met the minimum constitutional requirement of an "injury in fact," and as discussed herein, Plaintiffs have not shown such an injury.

Plaintiffs have suggested that they would be willing to amend their Complaint to add claims under the Administrative Procedures Act and the Federal

Tort Claims Act in order to gain standing to pursue their claims.  However, although Congress may grant an express right of action through legislative acts to persons who would otherwise be barred by the prudential standing rules, the minimum constitutional requirement of an "injury in fact" remains.  <u>Warth</u>, 422 U.S. at 501.  Failure to meet this threshold, one of the minimum requirements of Article III, closes off the possibility of taxpayer status.  <u>Tarsney v. O'Keefe</u>, 225 F.3d 929, 937-38 (8th Cir. 2000).

The Court notes that OCR confer standing upon Plaintiffs by "accepting and acting" upon their complaints to OCR because standing is a judicially conferred status.

The Court finds that Plaintiffs do not have standing to pursue claims against Defendants because they were not injured by OCR's conduct.  The proper plaintiffs in this action are any female ice hockey players who may have been injured by Defendants' conduct.   Although the Complaint does not indicate that Plaintiffs intended to bring this action on behalf of their daughters, or state any facts regarding whether their daughters are minors, the Court surmises that it is possible that Plaintiffs intend to represent their daughters in this action.  However, if Plaintiffs' daughters are no longer minors, they need to intervene or be joined in this action, because Plaintiffs must assert a personal injury to maintain standing to pursue these claims.  Thus, the Court grants Plaintiffs thirty

days to either amend the Complaint to explicitly state that they are pursuing this action on behalf of their minor children, or to allow their daughters to intervene in or join this action. If neither action occurs within thirty days, the Court will dismiss this case for lack of jurisdiction.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

> Plaintiffs are granted 30 days from the date of this order to allow Plaintiffs to amend their Complaint or to explicitly state that they are pursuing this action on behalf of their minor children, or to allow Plaintiffs' daughters to intervene or join this action; otherwise the Complaint will be dismissed with prejudice.

Dated:  June 14, 2006                    s / Michael J. Davis
                                         Judge Michael J. Davis
                                         United States District Court